UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Kari Sue Kramer and Paul Kramer, <br><br> Plaintiffs, <br><br> v. <br><br> Ford Motor Company, <br><br> Defendant. | Case No. 12-cv-1149 (SRN/FLN) <br><br><br> **MEMORANDUM OPINION AND ORDER** <br><br> **[REDACTED]** |

Thomas J. Murray and Mary S. O'Neill, Thomas J. Murray & Associates, 358 N. Main Street, Huron, Ohio 44839; Gregory N. McEwen, McEwen Law Firm, 5850 Blackshire Path, Inver Grove Heights, Minnesota 55076; Peter J. Kestner, Crawford & Kestner, P.A., 5854 Blackshire Path, Inver Grove Heights, Minnesota 55076; and James L. Murray, Murray & Murray Co., L.P.A., 111 East Shoreline Drive, Sandusky, Ohio 44870, for Plaintiffs.

Jennifer K. Wichelman and Michael R. Carey, Bowman and Brooke LLP, 150 South Fifth Street, Suite 3000, Minneapolis, Minnesota 55402; and Elizabeth B. Wright, Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant Ford Motor Company's Renewed Motion in Limine to Exclude the Testimony and Opinions of Neil Hannemann [Doc. No. 193], Defendant's Renewed Motion in Limine to Exclude the Testimony and Opinions of William Berg [Doc. No. 199], Defendant's Renewed Motion in Limine to Exclude the Testimony and Opinions of David Bilek [Doc. No. 203], Defendant's Renewed Motion for Summary Judgment [Doc. No. 189], and Defendant's Renewed Motion to Preserve

Confidential Designation Pursuant to Protective Order [Doc. No. 208]. For the reasons set

forth below, the Court grants in part and denies in part Defendant's Motion in Limine

related to Mr. Hannemann, denies Defendant's Motions in Limine related to Dr. Berg and

Mr. Bilek, grants in part and denies in part Defendant's Motion for Summary Judgment, and

grants in part and denies in part Defendant's Motion to Preserve Confidential Designation.

## II.     BACKGROUND

### A.     The Incident

This lawsuit arises from a single-vehicle accident involving Plaintiff Kari Sue

Kramer on May 9, 2008. (Am. Compl. [Doc. No. 61] ¶¶ 1, 10.) Briefly stated, Ms. Kramer

was driving southbound on Bluejay Avenue in Mayer, Minnesota. (See Carey Decl. in

Supp. of Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of

William Berg [Doc. No. 218] ("Carey-Berg Decl."), Ex. A (K. Kramer Dep.), at 129:16-17.)

As she approached Second Street, intending to take a left turn, she applied the brakes and

heard a "roar, revving sound," and the car "shot off." (Id. at 131:8-11.) Ms. Kramer says

that she "stepped on the brakes as hard as [she] could" and was able to slow the car down.

(Id. at 131:12-13.) The car hit a sign, came to a stop, and was "rocking" and "revving."

(See id. at 131:14-16.) Ms. Kramer turned to check on her daughter, who was in the

backseat, and noticed that the portion of the car in which her daughter was located was in

the opposite lane of traffic and "would be in danger." (Id. at 131:19-23.) Ms. Kramer then

put the car in reverse, and it "took off and shot backwards." (Id. at 131:24-25.) According

to Ms. Kramer, she "continued to push hard on [the] brakes, and the car would not stop."

(Id. at 131:25–132:1.) The car, traveling in reverse, eventually hit a house.

2

**B.    The Vehicle**

The subject vehicle was a 2005 Lincoln Town Car that was purchased on April 21, 2006. (Carey Decl. in Supp. of Def.'s Renewed Mot. for Summ. J. [Doc. No. 192] ("Carey SJ Decl."), Ex. 3 (P. Kramer Dep.), at 107:6-15.) It had 1,300 miles on it at that time. (Id. at 108:7-9.) Ms. Kramer never saw the owner's manual for the vehicle, did not review any literature or information about the vehicle prior to her accident, did not do any internet research about the vehicle prior to the accident, and did not talk to any employees of Defendant or any Ford dealership prior to the accident. (Carey SJ Decl., Ex. 2 (K. Kramer Dep.), at 64:13–65:17.) According to Paul Kramer, Kari Sue's husband, multiple entities serviced the vehicle between the time of purchase and the time of the accident, at which point there were approximately 130,000 miles on the car. (Carey SJ Decl., Ex. 3 (P. Kramer Dep.), at 112:5-13, 119:1-4.)

The Lincoln Town Car is part of Ford's "Panther Platform," along with the Crown Victoria and the Grand Marquis. (Carey SJ Decl., Ex. 4 (Engle Dep.), at 11:6-8.) Each of these vehicles is equipped with an electronic throttle control ("ETC") system. (Id. at 11:13-18.) An ETC system has three components: an electronic pedal, an electronic throttle body, and a powertrain control module ("PCM"). (Id. at 11:25–12:5.) As described by Ford engineer James Engle:

> The PCM is a computer which has inputs and outputs. The electronic pedal provides an input to the PCM from the driver. The driver presses the pedal, pedal will then send a signal to the PCM to let it know that the operator wants the throttle body to open to accelerate. The PCM will take those inputs, analyze them, and then after deciding it will send a signal to the electronic throttle body.

3

. . . .

> Electronic throttle body is a mechanical valve with electric motor on it.
> When the PCM tells the motor to open the valve, it will open, allow more air
> in and allow acceleration on the vehicle.

(Id. at 12:6-18.)  In other words, the driver communicates with a computer, and the

computer tells the throttle what to do.  (Id. at 13:11–14:22.)  The 2005 Lincoln Town Car's

accelerator pedal used three sensors to communicate with the PCM.  (Pls.' Mem. in Resp. to

Def.'s Renewed Mot. for Summ. J. [Doc. No. 231] (filed under seal) ("Pls.' SJ Opp."), Ex. 3

(Engle Dep.) at 145:25–146:17.)

In designing an ETC system, Defendant begins with a failure mode effects

analysis ("FMEA").  (See Carey SJ Decl., Ex. 4 (Engle Dep.), at 70:3–71:2.)  According

to Mr. Engle:

> FMEA is a design practice where before you start your design you define
> what your component is going to do, and before you do that design you
> have to figure out how it's going to fail so that when you do your design
> you will take into account the ways it could possibly fail to make certain
> your design will account for those issues, those potential issues.

(Id. at 70:20–71:2.)  Redaction

(Pls.' SJ Opp., Ex. 2

(FMEA Handbook excerpt), at 3.)

Defendant created a FMEA for the Lincoln Town Car's ETC system.  (Carey SJ

Decl., Ex. 4 (Engle Dep.), at 71:12-17.)  According to Plaintiffs, the FMEA for the 2005

Lincoln Town Car "identifies several failure modes that suddenly produce engine power

greater than commanded by the driver, and which were assigned the highest possible severity rating of 10." (Pls.' SJ Opp. at 2.) More specifically, Plaintiffs assert that the FMEA identifies a failure of the "'pedal assembly, main control [switch],'" the "'independent plausibility checker,'" and "the electronics during a sudden acceleration." (Id. at 3.)

Defendant presented a report on its ETC systems, titled "Ford Motor Company Electronic Throttle Control Information," to the National Highway Traffic Safety Administration ("NHTSA") in 2010 in response to the NHTSA's request for assistance in studying ETC systems (the "NHTSA Presentation"). (Def.'s Mem. of Law in Supp. of Renewed Mot. to Preserve Conf. Desig. Pursuant to Protective Order [Doc. No. 210] ("Def.'s Conf. Desig. Mem."), at 1.) In the NHTSA Presentation, Defendant states that it has "utilized the same general architecture for ETC since inception on 2003 model year Ford gasoline vehicles," and describes the changes that it has since implemented. (Wichelman Decl. [Doc. No. 250], Ex. 1 (NHTSA Presentation) (filed under seal), at 8–9.) Defendant goes on to discuss its design process, including its use of a FMEA. (Id. at 11–12.) Defendant also describes its "Risk Assessment":

> Guiding Principles of ETC Design
>
> Ford considers unwanted acceleration as a condition for which no credible single failure of the powertrain system shall lead to an unsafe operating condition.
>
> Torque Supplied shall not exceed Torque Requested resulting in vehicle acceleration by more than 0.15g over 1 second.
>
> If a "fault" is detected by the monitor system, the system must reconfigure into a safe state such that any additional credible single point failure does not

result in an unsafe condition.  The monitor is able to reduce power only, it is NOT able to increase power.

Once functionality is removed from the driver, the system will not reset during the same key cycle.

Redaction

(Id. at 15–16 (emphases in original).)  According to Defendant, as of the date of the

Presentation, it "ha[d] not identified any events that indicated a 'delivered torque greater

than demand torque' event that led to an accident, nor any evidence of [electromagnetic

interference] interaction causing ETC control issues."  (Id. at 33.)

C.      This Lawsuit

Plaintiffs allege that the subject accident was the result of a sudden and unintended

acceleration ("UA") of the vehicle that occurred—or was not prevented—because of several

defects in the vehicle.  (See Am. Compl. ¶¶ 10, 14–21.)  These alleged defects include an

ETC system that opened the throttle without input from the driver, failure to include a

failsafe mechanism, failure to include a brake override system, and failure to provide

vacuum to the brake booster when the throttle is maintained in an open condition.  (See id.

¶¶ 15–17, 20.)  The Amended Complaint in this matter asserts eight causes of action against

Defendant: strict liability for defective design (Count I), strict liability for failure to warn (Count II), negligent design (Count III), negligent failure to warn (Count IV), breach of warranty (Count V), negligence per se (Count VI), consumer fraud (Count VII), and loss of consortium (Count VIII). (Id. ¶¶ 1, 13–49.) Plaintiffs seek past and future compensatory damages (including for lost earnings, medical and life care expenses, pain and suffering, and emotional distress), damages under the Minnesota Consumer Fraud Act, costs and disbursements, pre-judgment interest, and attorneys' fees. (See id. ¶¶ 11, 21, 24, 27, 32, 37, 41, 44.)

## III.   MOTIONS IN LIMINE

In support of their case, Plaintiffs seek to rely on the opinions and testimony of Neil Hannemann, William Berg, and David Bilek. Defendants have moved to exclude the opinions and testimony of all three individuals.

Under Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. According to the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., a court must act as a "gatekeeper" and evaluate whether proffered

expert testimony passes muster under Rule 702.  509 U.S. 579, 597 (1993).  Thus, the Court

articulated a non-exhaustive list of factors to consider when determining whether an

expert's methodology is reliable, including:  whether the methodology has been tested,

whether it has been subjected to peer review and publication, the known or potential rate of

error, the existence and maintenance of standards controlling the methodology, and whether

the methodology is generally accepted within the relevant scientific community.  See id. at

593–94.

Although courts may allow expert testimony only when it is both relevant and

reliable, id., "Rule 702 reflects an attempt to liberalize the rules governing the admission of

expert testimony" and favors admissibility over exclusion, Lauzon v. Senco Prods., Inc.,

270 F.3d 681, 686 (8th Cir. 2001) (internal quotation marks omitted).  "Gaps in an expert

witness's qualifications or knowledge generally go to the weight of the witness's testimony,

not its admissibility."  Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir.

2006) (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice and

Procedure: Evidence § 6265 (1997)).  Thus, "[t]he exclusion of an expert's opinion is

proper only if it is so fundamentally unsupported that it can offer no assistance to the jury."

Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations

marks omitted).

### A.     Neil Hannemann

Defendant seeks to exclude the testimony and opinions of Neil Hannemann.  Mr.

Hannemann has a B.S. in mechanical engineering and over thirty years of experience

working in the automotive industry on vehicle design, testing, research, and development

related to, among other things, engine systems, brake systems, and vehicle dynamics. (Pls.'
Mem. in Opp. to Def.'s Mot. to Exclude the Testimony of N. Hannemann [Doc. No. 90]
("Pls.' Orig. Hannemann Opp."), Ex. 1 (Hannemann CV), at 1–2.) He has worked for
several automobile manufacturers, including Ford and DaimlerChrysler, and he currently
works as an automotive consultant at his own firm. (Id.) Mr. Hannemann has provided trial
and deposition testimony in numerous cases. (See id. at 4–5.)[1]

   Plaintiffs hired Mr. Hannemann to render opinions as to "the safety performance of
the subject vehicle in [the] accident." (Carey Decl. in Supp. of Def.'s Renewed Mot. in
Limine to Exclude the Testimony and Opinions of N. Hannemann [Doc. No. 198] ("Carey-
Hannemann Decl."), Ex. 1 (Hannemann Report) (filed under seal), at 1.) More specifically,
Mr. Hannemann was asked to: (1) "determine whether the electronic throttle control (ETC)
system in the subject 2005 Lincoln Town Car was defective and unreasonably dangerous;"
(2) "determine whether Ford . . . reasonably investigated Sudden Unintended Acceleration
(SUA) events and the root cause of such events from an engineering perspective;"
(3) "determine whether the subject 2005 Lincoln Town Car should have had additional
features to enhance the failsafe characteristic of the electronic throttle system, specifically a

---

[1]    In one of those cases, Tarango v. Ford Motor Co., No. 12-07-20190-CVR (Tex.
Dist. Ct. Jan. 23, 2014), the court denied a similar motion in limine to exclude Mr.
Hannemann's opinions that a 2005 Lincoln Town Car experienced UA, the ETC system
in the vehicle was defective for failure to include a brake override system, and the brake
override system was an available and feasible alternative that could have prevented the
accident at issue. (Pls.' Mem. in Opp. to Def.'s Renewed Mot. in Limine to Exclude the
Opinions and Testimony of N. Hannemann [Doc. No. 226] (filed under seal), Ex. 9, at 1–
2.)

brake override system;" and (4) "analyze the brake system of the 2005 Lincoln Town Car, including the brake light bulb and the vacuum assist system." (Id. at 2–3.)

In developing his opinions, Mr. Hannemann inspected the subject vehicle and reviewed, among other things, the police accident report, deposition testimony, Ford documents, expert reports, photographs, NHTSA complaints, and exemplar testing results. (Id. at 5–6.) He concluded that:

A.    Mrs. Kramer's Lincoln Town Car experienced an unintended acceleration event. Mrs. Kramer was properly applying the brakes in her Lincoln Town Car.

B.    The subject ETC system is defective and unreasonably dangerous. One or several integral electrical or mechanical components intermittently failed. Incorrect signals are being sent to the throttle body during the SUA events experienced by Mrs. Kramer and others. These failures allowed the vehicle to accelerate without driver input.

C.    The ETC system is defective by failing to include a brake override system. Such a system allows closing of the throttle body or shutdown of the fuel/air mixture upon application of the brakes. Inclusion of such an available design would have prevented the subject accident by allowing the brake to override the engine throttle.

D.    Brake applications while the engine throttle body was not closed results in loss of vacuum power assist. This greatly increases the amount of brake pedal effort required to stop the vehicle. This loss of power assist results in the brakes system being unable to overcome the engine.

E.    Had Mrs. Kramer's Lincoln Town Car been equipped with a brake override system she would have been able to easily control her vehicle and this accident would not have occurred.

F.    Had Mrs. Kramer's Lincoln Town Car been programed [sic] with a reverse gear speed limiter she likely would have been able to control her vehicle but even if the accident still happened, it would have occurred at a lower speed leading to less severe, if any, injuries.

(Id. at 17.) More specifically as to brake override systems, which return the engine throttle body to a closed position, Mr. Hannemann stated that "[m]any auto companies equip vehicles that they manufacture (which are equipped with an electronic throttle system) with a brake override system," including Nissan, Chrysler, VW, BMW, and Mercedes Benz. (Id. at 7.) In regard to the Ford/Lincoln throttle design and development, Mr. Hannemann determined:

> A.   The ETC system is defective by failing to include a brake override system. Such a system allows closing of the throttle body or shutdown of the fuel/air mixture upon application of the brakes. Inclusion of such an available design would have prevented the subject accident by allowing the brake to override the engine throttle. Ford of Europe incorporated such systems in some of its production models. The basis and reason for this opinion include:
>
> > 1.   The technology for a brake override system has existed since the invention of cruise control.
> >
> > 2.   Many other auto manufacturers have used brake override systems since their initial use of an electronic throttle control system.
> >
> > 3.   Ford equipped the vehicles that it sold in Europe with a brake override system starting with 2005 Model Year vehicles.

(Id. at 12.)

In addition to the above findings, Mr. Hanneman analyzed a filament from the right rear brake light bulb of the subject vehicle and concluded that the brake pedal was released approximately 1.5 seconds prior to impact during the accident. (Id. at 5.) This conclusion was based on a comparison of the filament to figures published in a Northwestern University study of light bulb filaments in traffic collisions (the "Northwestern Study"), as well as testing conducted by Mr. Hannemann's assistant, Richard Hille. (Id.) As for the

comparison to the Northwestern Study, Mr. Hannemann stated that no measurements of the

subject filament were necessary because it was "a qualitative evaluation, not a quantitative

measure"—i.e., "the issue is whether there is curvature or not; the amount will vary

depending on the precise time the voltage was extinguished prior to impact." (Pls.' Orig.

Hannemann Opp., Ex. 3 (Hannemann Aff.) ¶ 4.) As for the bulb testing, Mr. Hille

performed these tests by lighting bulbs for several seconds and then turning off the

electricity and dropping the bulbs from a height of 17 feet. (Carey-Hannemann Decl., Ex. 6

(Hille Dep.), at 54:13–55:5.) Mr. Hille completed four tests, varying the amount of time—

as measured by the stopwatch on his phone—that passed between the electricity being

switched off and the bulb's impact with the floor. (See id. at 56:20–59:13.) Mr. Hille was

not following any protocol, did not consult with anyone or any articles regarding the testing,

and does not believe that the test he performed has ever been done in the automotive field.

(Id. at 31:15-20, 51:17–52:15.)

Subsequent to completion of Mr. Hannemann's report, Professor Todd H. Hubing of

Clemson University's International Center for Automotive Research completed certain

research and testing regarding ETC systems and UA on various vehicles, including a

2005 Ford Mustang.[2] (See Mem. Op. & Order dated Jan. 29, 2015 [Doc. No. 182], at 3.)

Although the Court concluded that Professor Hubing was not a proper court-appointed

expert witness, the Court found that his research might be relevant to Mr. Hannemann's

---

[2] According to Plaintiffs, Professor Hubing's report has completed the peer-review
process. (Pls.' Mem. in Opp. to Def.'s Renewed Mot. in Limine to Exclude the Opinions
and Testimony of N. Hannemann [Doc. No. 226] (filed under seal), at 16 n.1.)

report and permitted Plaintiffs time to allow Mr. Hannemann to review Professor

Hubing's report and—based on that information—to submit an amended or supplemental

report of his own. (See id. at 8.)  In his supplemental report, Mr. Hannemann

summarizes certain of Professor Hubing's findings, including that:  a failure in a single

electrical connection—or multiple failures—can cause an unwanted throttle opening, that

certain ETC systems (including Ford's) have a higher susceptibility to unwanted

acceleration than other systems, and that the Ford ETC system does not always issue a

trouble code when there is a throttle fault or malfunction.  (Carey-Hannemann Decl., Ex.

3 (Hannemann Supplemental Report) (filed under seal), at 1–2.)  Mr. Hannemann stated

that the 2005 Ford Mustang ETC system that Professor Hubing tested is "substantially

similar" to the ETC system on the subject 2005 Lincoln Town Car, and that Defendant's

brake override system would likely mitigate the type of electronic failures identified by

Professor Hubing.  (Id. at 2.)  As for the latter contention, Mr. Hannemann stated that

Defendant had two types of brake override systems—a "full time" system introduced in

2010 and a "light" system that existed prior to 2010—and that at least the "light" version

addresses electronic faults.  (Id. at 3.)  This discussion was based on the testimony of

Ford engineer Paul Szuszman that apparently was unknown to Mr. Hannemann at the

time of his initial report.  (Id.)

　　　　Defendant now seeks to exclude Mr. Hannemann's opinions (and related testimony)

that (1) the vehicle's ETC system was defective and unreasonably dangerous; (2) the

vehicle was defective because it was not equipped with a brake override system; (3) the

brake pedal in the subject vehicle was released 1.5 seconds prior to impact; and (4) brake

applications made while the throttle is closed result in the loss of vacuum power assist.  (See Mem. in Supp. of Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of N. Hannemann [Doc. No. 195] (filed under seal) ("Def.'s Hannemann Mem."), at 1–4.)[3]

### 1.   ETC system

First, Defendant argues that Mr. Hannemann's opinion that the subject vehicle's ETC system was defective is irrelevant because he did not identify any defect or failure in the system that did or could cause UA and because he is not aware of any publications that have found that Defendant's ETC system can cause UA.  (Id. at 17–18.)  Defendant also asserts that Mr. Hannemann's supplemental report impermissibly parrots Professor Hubing's research and fails to tie the research to the subject vehicle.  (Id. at 17–19.)

In opposition, Plaintiffs assert that Mr. Hannemann did not admit that he could not identify a defect, but instead stated that he would not expect to find evidence of an electronic failure in a post-incident inspection.  (See Pls.' Mem. in Opp. to Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of N. Hannemann [Doc. No. 226] (filed under seal) ("Pls.' Renewed Hannemann Opp."), Ex. 1 (Hannemann Aff.) ¶¶ 2, 8.) And, Plaintiffs argue, Professor Hubing's research confirms that the accelerator sensors

---

[3]     Defendant states in a footnote that it challenged several more of Mr. Hannemann's opinions in its original motion in limine.  (Def.'s Hannemann Mem. at 4 n.2.)  However, because Plaintiffs did not defend those opinions in their initial opposition, Defendant assumed that Plaintiffs had abandoned those opinions.  (Id.)  Defendant did not re-brief its arguments relating to those opinions in its renewed motion, except for a cursory summary in a footnote in its reply brief.  (See Reply in Supp. of Def.'s Renewed Mot. in Limine to Exclude the Opinions and Testimony of N. Hannemann [Doc. No. 243] (filed under seal), at 11 n.4.)  Because those issues have not been fully briefed by both parties in the pending motion, the Court declines to address them further.

could open the throttle without generating a trouble code on the subject vehicle.  (See Pls.'
Renewed Hannemann Opp. at 2, 14–16; id., Ex. 1 (Hannemann Aff.) ¶¶ 2, 8.)  According to
Plaintiffs, Mr. Hannemann has not simply passed Professor Hubing's findings off as his
own, but rather has opined as to issues going beyond Professor Hubing's research—i.e., that
the 2005 Town Car is defective because the failsafe modes do not prevent UA and that an
alternative design should have been incorporated.  (Pls.' Renewed Hannemann Opp. at 14.)

     The Court agrees with Plaintiffs.  As Mr. Hannemann notes in his affidavit and
deposition testimony, it is his opinion that he would not be able to detect, after-the-fact, the
type of failure that caused the subject vehicle to experience UA:

> Q:    Can you tell me what it is about the mitigation strategies that made it
> unable to detect the acceleration over .15 Gs?
>
> A:    This particular car, I can't.  <u>My opinion is that these are the type of
> failures that don't leave traces, so it's not always possible to determine
> afterwards what happened.</u>
>
> Q:    But with respect to this particular vehicle and this particular accident,
> you cannot identify any specific defect that resulted in the vehicle
> accelerating without driver input, is that correct?
>
> A:    Specifically this vehicle, correct.
>
> Q:    Have you been able to identify on any Ford vehicle a specific defect
> that would cause a vehicle to accelerate without driver input?
>
> A:    Specifically on the vehicle, no, I haven't.
>
> . . . .
>
> Q:    Have you looked on Ford vehicles for something in the electronics that
> could cause the vehicle to accelerate without driver input?
>
> A:    Not beyond what any of the defense experts have done in any of their
> protocols.  <u>My experience tells me I just don't expect to find anything.</u>

(Carey-Hannemann Decl., Ex. 2 (Hannemann Dep.) (filed under seal), at 50:23–51:25

(emphases added).)  Such an opinion is still relevant to whether a failure may have occurred,

especially in light of a peer-reviewed publication that found that Defendant's ETC system

can cause UA (notably, without issuing a trouble code)—Professor Hubing's report.

    And, contrary to Defendant's assertion that Mr. Hannemann has failed to tie

Professor Hubing's report regarding the 2005 Ford Mustang to the subject vehicle, Mr.

Hannemann states in his supplemental report that "[t]he 2005 Ford Mustang ETC system

that Dr. Hubing tested is substantially similar to the ETC system on the subject 2005

Lincoln Town Car." (Carey-Hannemann Decl., Ex. 3 (Hannemann Supplemental Report)

(filed under seal), at 2.)  He also states in an affidavit submitted in response to Defendant's

motion to exclude his testimony that he "certainly" is aware of the similarities between the

vehicles.  (Pls.' Renewed Hannemann Opp., Ex. 1 (Hannemann Aff.) ¶ 9.)[4]  Notably,

Defendant does not deny that those vehicles have the same ETC system.

---

[4]    In addition to Mr. Hannemann's statements, Plaintiffs previously submitted a declaration of Samuel Sero that attached several documents that appear to support Plaintiffs' and Mr. Hannemann's position, including a slide from the NHTSA Presentation stating that "Ford has utilized the same general architecture for ETC since inception on 2003 model year Ford gasoline vehicles," and a document from the Motor All Data website stating that the 2005 Ford Mustangs and Town Cars use the same communication language protocol to communicate with the powertrain control module. (Pls.' Supplemental Mem. in Supp. of Their Mot. for the Appointment of Dr. Hubing as an Expert Pursuant to Evid. R. 706, Ex. 4 (Sero Decl.), Exs. 1, 4.)  Mr. Sero also stated that the ETC systems on the 2005 Mustang and 2005 Town Car are "substantially similar." (Id., Ex. 4 (Sero Decl.) ¶ 5.)  And, Plaintiffs' counsel stated during oral argument on this matter that, during a recent deposition of one of Ford's experts, Karl Stopschinski, Mr. Stopschinski admitted that the electronic diagram for the 2005 Mustang is identical to the diagram for the 2005 Town Car and the other Panther Platform vehicles.  (Tr. of Nov. 6, 2015 Hr'g [Doc. No. 253], at 18:14–19:5.)

Finally, as Plaintiffs argue, Mr. Hannemann has not simply parroted Professor Hubing's research. For example, in addition to summarizing Professor Hubing's findings, Mr. Hannemann opined as to the ability of Defendant's brake override system to mitigate the type of fault that Professor Hubing found to exist. Accordingly, Mr. Hannemann's opinions regarding the ETC system are relevant.

### 2.    Brake override system

Second, Defendant argues that Mr. Hannemann's opinion that the ETC system is defective for failure to include a brake override system is unreliable and irrelevant because his theory is untested and not generally accepted, and because it is based on the faulty premise that there was a defect in the ETC system of the subject vehicle that caused UA. (Def.'s Hannemann Mem. at 11, 19.) Defendant also asserts that the opinion must be excluded because Mr. Hannemann made no attempt to determine whether it would have been feasible to incorporate a brake override system into the subject vehicle or whether such a system would have prevented the accident. (Id. at 11, 21–24.) Moreover, Defendant argues, the opinion is irrelevant because the effectiveness of a brake override system depends upon whether and when the brakes are applied—facts which cannot be determined in this case. (Id. at 11, 24.) Finally, Defendant contends that Mr. Hannemann's supplemental report impermissibly included additional opinions about the brake override system that are not based on Professor Hubing's research. (Id. at 26 n.7.)

In response, Plaintiffs argue that a brake override system was a feasible alternative design in the subject vehicle as evidenced by Defendant's use of such a system in some of its European models in 2005. (Pls.' Renewed Hannemann Opp. at 7.) Similarly, Plaintiffs

17

claim that the fact that Defendant uses that system demonstrates that the safety feature is

generally accepted.  (Id.)  Plaintiffs also argue that Professor Hubing's research confirms

that the accelerator pedal signals can fail in such a way that a brake override system would

have been triggered, and that both Ms. Kramer's testimony and Mr. Hannemann's testing

demonstrate that Ms. Kramer had applied the brake during the incident.  (Id. at 7–8, 10.)

Defendant has not persuaded the Court that Mr. Hannemann's opinions related to the

brake override system should be excluded.  As an initial matter, the Court finds that Mr.

Hannemann's extensive experience as a mechanical engineer in the automotive industry

qualifies him to render an opinion regarding brake override systems in this case.  Moreover,

as Mr. Hannemann states, the purpose of a brake override system is to return an open engine

throttle to the closed position and allow the brake to override the engine throttle, and many

auto manufacturers—including Defendant—equip vehicles that have an ETC system (like

the subject vehicle) with a brake override system.  Thus, Mr. Hannemann has demonstrated

that his theory that a brake override system could have prevented an accident caused by UA

is generally accepted.[5]

---

[5]     In addition, according to Ford engineer Paul Szuszman, Ford apparently was one
of the only companies that was still using a 3-track accelerator pedal system as of 2008.
(Pls.' Renewed Hannemann Opp., Ex. 2 (Szuszman Dep.) (filed under seal), at 191:4-7.)
The "industry standard practice" at the time was a 2-track system coupled with a "light"
brake override system, which is activated when electrical faults are detected.  (Id. at
176:15-23, 190:13–192:8.)  Based on this testimony, Plaintiffs argue that the industry
standard at the time the 2005 Lincoln Town Car was manufactured was the 2-track
system and so there was no reason the subject car could not have been equipped with the
"light" brake override system.  (Pls.' Renewed Hannemann Opp. at 7.)  Defendant does
not contest that the 2-track system and "light" brake override system were the industry
standard in 2005.  (See Reply in Supp. of Def.'s Renewed Mot. in Limine to Exclude the
Testimony and Opinions of N. Hannemann [Doc. No. 243] (filed under seal), at 7 & n.1.)

Mr. Hannemann also has sufficiently opined as to the feasibility of a brake override system in the subject vehicle.  An expert rendering an opinion regarding a feasible alternative design in a design defect case is not required to manufacture a new device or a prototype in order for the opinion to be admissible, but the opinion must be "sufficiently grounded to be helpful to the jury."  Unrein v. Timesavers, Inc., 394 F.3d 1008, 1012 (8th Cir. 2005).  Accordingly, the expert may, for example, prepare drawings showing how the new design could be incorporated into the subject product or point to use of the alternative design on similar products.  Id.; see also Young v. Pollock Eng'g Grp., Inc., 428 F.3d 786, 790 (8th Cir. 2005) (stating that the experts did not need to conduct "a detailed feasibility study" of the proposed safety modification because it already had been incorporated and used with the allegedly defective product).  The expert also must demonstrate that the proposed modification "would work to protect the machine operators but would not interfere with the machine's utility."  Unrein, 394 F.3d at 1012.  Here, Mr. Hannemann has pointed to the fact that Ford equipped the vehicles that it sold in Europe with a brake override system starting with 2005 model year vehicles.  Accordingly, Mr. Hannemann has sufficiently demonstrated that the proposed alternative design was used by Defendant in similar products and would not interfere with the vehicles' utility.[6]

---

This provides further support for the notion that Mr. Hannemann's theory is generally accepted.

[6]     In addition, the fact that a 2-track accelerator pedal system and "light" brake override system were apparently the "industry standard" at the time the 2005 Town Car was manufactured demonstrates that it would have been feasible to design the subject vehicle in that same manner.

Finally, as discussed herein, Plaintiffs have presented evidence that a fault in the subject vehicle's ETC system could have caused UA, and that Ms. Kramer had applied the brakes (which would trigger a brake override system). Thus, Mr. Hannemann's brake override system opinion is relevant. And, to the extent that Mr. Hannemann offers new opinions regarding the brake override system in his supplemental report, those opinions pertain to whether Defendant's systems would likely have mitigated the fault identified by Professor Hubing and so are sufficiently tied to Professor Hubing's research. For these reasons, Mr. Hannemann's opinions and testimony that the subject vehicle's ETC system was defective for failure to include a brake override system are admissible.

### 3.     Release of the brake pedal

Third, Defendant argues that Mr. Hannemann's opinion that Ms. Kramer released the brake pedal approximately 1.5 seconds prior to impact with the house is unreliable because the underlying analysis of the brake filament was unscientific. (Def.'s Hannemann Mem. at 24.) Defendant asserts that neither Mr. Hannemann nor Mr. Hille took any measurements of the filament and instead made only a subjective visual comparison to the photos in the Northwestern Study, the subject filament was only a partial filament as compared to the fully-intact filaments in the Northwestern Study, and neither Mr. Hannemann nor Mr. Hille knows what impact speed was used in the Northwestern Study. (Id. at 24–25.) Finally, Defendant states that there are several issues with Mr. Hille's bulb-drop testing—e.g., it was not based on any written protocol, it has never been done by anyone else in the automotive industry, he did not consult with anyone in developing the test, and it was not intended to replicate the forces at play in the subject incident. (Id. at 13 n.6.)

Although Plaintiffs acknowledge that Defendant challenges Mr. Hannemann's methodology, they argue simply that his opinion is supported by the bulb-drop testing and the Northwestern Study. (See Pls.' Renewed Hannemann Opp. at 11–12.) According to Plaintiffs, no measurements of the filament were necessary because it is the presence of the curvature in the subject filament—and not its size—that confirms that the brake light had been illuminated prior to impact. (See id. at 12.) Thus, Plaintiffs argue, Mr. Hannemann's opinion is not speculative, but "is based on testing and the solid principles of science." (Id.)

The Court finds that Mr. Hannemann may present his opinion regarding the time at which the brake pedal was released, to the extent that the opinion is based on the Northwestern Study. As the Eighth Circuit has noted, "an expert may extrapolate from data supplied by other experts," Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (internal quotation marks omitted), and given Mr. Hannemann's extensive experience in the automotive industry—including in vehicle design, testing, and dynamics—the Court finds that he may provide an expert opinion derived from the published Northwestern Study of light bulb filaments in traffic collisions. And, to the extent that Defendant believes that the facts or the Northwestern Study do not support Mr. Hannemann's opinion, Defendant is entitled to challenge him on cross-examination. See id. ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (internal quotation marks omitted).

However, Mr. Hannemann may not testify about Mr. Hille's bulb-drop testing. Mr. Hille acknowledged that no protocol was followed or articles consulted in developing and

conducting the test, and that the testing has not been performed before in the automotive industry. Thus, it does not appear to the Court that the underlying methodology for this testing is sufficiently reliable to be presented to the jury.

### 4.    Vacuum power assist

Finally, Defendant argues that Mr. Hannemann's opinion regarding loss of vacuum power assist is irrelevant because there is no evidence in this case that Ms. Kramer released pressure from the brake or that there was a loss of vacuum power assist. (Def.'s Hannemann Mem. at 26–27.) Plaintiffs, on the other hand, point out that Ms. Kramer's testimony, Mr. Hannemann's research, and Dr. Berg's analysis of the speed at impact (discussed below) all suggest that Ms. Kramer was applying the brake during the incident. (Pls.' Renewed Hannemann Opp. at 14.) They also argue that, despite Defendant's insistence to the contrary, Mr. Hannemann did not concede that there was no loss of vacuum power assist in this case. (Tr. of Nov. 6, 2015 Hr'g [Doc. No. 253] ("Tr."), at 50:16-22.)

The Court agrees with Defendant that Mr. Hannemann's testimony regarding loss of vacuum power assist is not admissible. As Defendant points out, Mr. Hannemann stated multiple times during his deposition that there is no evidence in this case that Ms. Kramer lost vacuum power assist. (See Carey-Hannemann Decl., Ex. 2 (Hannemann Dep.) (filed under seal), at 174:7-11, 227:24–228:12, 243:9-13.) And, although Mr. Hannemann also stated that it was possible that the vacuum had been depleted, he opined that depletion of the vacuum system did not necessarily play any role in the accident:

> Q:    So in this particular case there's a lot of discussion in your report about loss of vacuum assist as a result of pumping and that sort of thing, but that doesn't actually apply for this accident, does it?

A.      I think it still applies.  You can lose vacuum in the Town Car with just one brake application, and you can—even if you just release pressure without taking your foot off the brakes, that can also deplete vacuum.

Q:      In this particular case, Mrs. Kramer doesn't say she ever released pressure, does she?  In fact, to the contrary, she says she increased the pressure on the brake, doesn't she?

A.      Correct.

Q:      So at least as far as the evidence goes here, we don't have any evidence that she ever released pressure from the brake so as to lose vacuum assist, correct?

A.      Correct.

Q:      Again when I look at pages 7, 8 and 9 of your report, you spend a lot of time talking about alternatives to vacuum brake and loss of power assist, et cetera, but those don't actually apply in this particular accident, do they?

A.      They don't—the whole accident could have played out with her applying the type of brake pressure she said, holding the brake, so it's not necessarily a requirement to have this.  Now, just movements of the pedal where a person—it's actually almost impossible to hold the pedal steady enough to not deplete your vacuum, even over hitting bumps and things, so there would have been some depletion of vacuum even with the person just holding their foot on the brakes, but it's not—I guess I'd say it's not an enabler for the whole situation.

Q:      I guess I'm saying if I look at pages 7, 8 and 9, where you talk about loss of power assist and the alternatives to a basic vacuum brake system and federal regulations, et cetera, those don't actually apply in this particular accident, do they?

A.      Well, we don't know if she lost any vacuum boost or not.

Q:      You don't have any evidence here that she lost any vacuum boost, do you?

A:      Correct.  I do have—I have what I call—I call it the reverse testing.  What is it called here?  Brake to reverse.  In these tests, even when I

23

was holding the brake the whole time, there was a [sic] some depletion
of the vacuum system.   <u>So the characteristic is there, but it's not
necessarily a cause of the accident.</u>

(<u>Id.</u> at 173:19–175:18 (emphasis added).)   Accordingly, the Court finds that Mr.

Hannemann's testimony regarding loss of vacuum power assist is not relevant to the issues

in this case and should be excluded.   For these reasons, the Court is persuaded that only a

portion of Mr. Hannemann's opinions and testimony, as noted herein, should be excluded.

### B.   William Berg

Defendant also seeks to exclude the testimony and opinions of William Berg.

According to Dr. Berg's curriculum vitae, he has a B.S. and M.S. in civil engineering, as

well as a Ph.D.  (Carey-Berg Decl., Ex. C (Berg CV), at 1.)  He has acted as a "[c]onsulting

engineer" since 1971, providing "[e]xtensive experience and expert witness testimony in the

application of engineering and human factors methodologies to the reconstruction and

causal factors analysis of traffic accidents."  (<u>Id.</u>)  He also was a professor of civil

engineering for approximately twenty-eight years, during which time he taught continuing

education courses for practicing engineers in the areas of human factors in traffic safety and

accident reconstruction, and conducted research studies in the areas of driver behavior and

accident reconstruction.  (<u>Id.</u>)  Dr. Berg's list of publications includes several articles

regarding causal and human factors in accidents.  (<u>See id.</u> at 5–7.)

In his expert report for this case, Dr. Berg states that he conducted "engineering and

human factors studies . . . relative to:  a) whether driver error is a likely cause of sudden

acceleration or unwanted acceleration incidents; and b) the causal factors associated with

the May 9, 2008, sudden acceleration incident involving a 2005 Lincoln Town car being

operated by [Plaintiff]." (Id., Ex. D (Berg Report), at 1.)  After critiquing several

government studies of sudden acceleration or unwanted acceleration incidents, and

describing nine published research articles on vehicle pedal configuration and driver pedal

errors, (see id. at 3–8), he concludes as follows:

> The research findings documented in the . . . government studies and
> technical publications show that the occurrence of driver pedal error is very
> rare, is essentially independent of pedal configuration, and can only be
> induced in a laboratory or field environment by artificially creating a sudden,
> unexpected, hazard that the subject is to respond to as rapidly as possible.
> Even in these experiments, with only one exception, the driver immediately
> recognized and corrected the pedal error.  Extensive research has revealed no
> in-vehicle physical evidence following a sudden acceleration incident that
> would confirm the occurrence of a pedal error by the driver of the vehicle.  In
> addition, available empirical and scientific evidence does not support a
> finding that drivers are the cause of sustained open throttle accelerations as
> defined by NHTSA.

(Id. at 8.)

Dr. Berg then describes the "engineering and human factors studies" that he

undertook with respect to the causal factors associated with the subject incident, which were

based on his review of:  (1) the police accident report of the incident; (2) photographs of the

vehicle and accident scene taken on May 23 and June 11, 2008; (3) depositions or

statements of Plaintiff and several other witnesses; (4) reports prepared by an engineering

company; and (5) Google Earth imagery of the site.  (Id.)  As part of his analysis, Dr. Berg

used "photogrammetric methods and typical crush stiffness coefficients" to determine that

the vehicle was traveling in the range of 23 to 29 miles per hour when it hit the house.  (Id.

at 9.)  And, after considering the "prevailing driver, vehicle, roadway, or environmental

conditions that would produce a delayed, incorrect, or non-response to a hazard on the part

of the driver," he determined:

1.    At the initiation of the sudden acceleration event while starting her left-turn maneuver at a residential street intersection, Ms. Kramer was engaged in the control level of the driving task.  A left-turn maneuver is a repetitive, learned activity that does not require large pedal forces. There was no hazard present that required a sudden, hard brake application as an evasive maneuver that might have resulted in a pedal error.    The sudden acceleration and departure from the driver's intended path of travel was unintended and not reasonably attributable to driver error.

2.    Given the reported high rate of acceleration and loud engine roar, the stopping of the vehicle next to the traffic sign after about 105 ft of travel with the engine still at high RPM indicates that Ms. Kramer had applied sufficient brake pedal force to overcome the power and acceleration being generated by the engine.  This is consistent with her testimony and consistent with the absence of any driver pedal error.

3.    When Ms. Kramer shifted the transmission from drive to reverse while the engine was still at a high RPM, the vehicle would be expected to accelerate rapidly backwards, with the rate of acceleration being partially dependent on the level of any brake application.  Given that the engine was still at a high RPM and that Ms. Kramer had successfully brought the vehicle to a stop by means of a brake application, there is no basis to conclude that a driver pedal error precipitated the acceleration in reverse.

4.    Ms. Kramer's inability to bring the vehicle to a stop prior to reaching point of impact with the house would have been affected by several factors:  a) it is more difficult to control a vehicle moving in reverse as opposed to drive; b) distraction related to the presence of the child in the rear seat; c) impact forces when the vehicle struck the curb in the northwest corner of the intersection; and d) lack of prior experience in overcoming an unwanted high acceleration and speed while the vehicle is moving in reverse.

Based on the above, there is no basis to conclude that the subject sudden acceleration event was caused by driver error or a pedal misapplication.

(<u>Id.</u> at 10.)

Dr. Berg also engaged in accident reconstruction and testified at his deposition that the subject vehicle would have attained a speed of approximately 42 miles per hour by the time it hit the house, assuming that it was operating with a wide-open throttle. (<u>Id.</u>, Ex. B (Berg Dep.), at 49:12-22.) However, given that the speed of impact was in the mid-20 mile per hour range (approximately 26 miles per hour), Dr. Berg concluded that there was "some retardation due to brake application." (<u>Id.</u> at 14:25–15:2, 49:23–50:6.) According to Dr. Berg, "[t]here is nothing else . . . that would cause that amount of retardation other than braking." (<u>Id.</u> at 50:15-16.) Dr. Berg based this opinion in part on the data developed by Mr. Hannemann regarding the acceleration capability of the subject vehicle. (<u>Id.</u> at 49:15-18.) Dr. Berg explained his calculations as follows:

> The data that were of interest to me dealt with the maximum acceleration capability of the exemplar vehicle under wide-open throttle while in reverse. That turns out to be approximately .35 Gs, and so I did some calculations first to determine what speed would be attained assuming a high RPM that was .35 G acceleration in reverse over 100 feet, which happens to be the approximate distance the vehicle traveled from its position stopped by the—I think it was a speed limit sign to impact with the curb in the northwest quadrant of the intersection. That turns out to be 32 miles per hour and the elapsed time would be about 4.25 seconds assuming .35 G in acceleration.
>
> From then I checked to see what the speed would be at the end of 165 feet of travel at—in reverse at .35 G acceleration and that would be 42 miles per hour and the 165 feet is the approximate total distance the vehicle—subject vehicle driven by Ms. Kramer traveled in reverse.
>
> Next I looked at roughly the midpoint of the—my reconstructed speed at impact with the house, which would be approximately 26 miles per hour, and I did a calculation to determine what the average equivalent constant average acceleration rate would be to go from zero to 26 miles per hour over 165 feet and that turns out to be an acceleration of approximately .14 Gs with an elapsed travel time of about 8.6 seconds.

Then I looked at again constant acceleration at .14 Gs to the impact with the curb. In other words, if you accelerated .14 Gs over 100 feet starting from a stopped position, what would the speed be at the end of that 100 feet? In other words, what would the speed of the vehicle be at when it arrived at the curb? That turns out to be about 20.5 miles per hour with an elapsed time of 6.6 seconds.

And so my conclusion from those calculations is that assuming a wide-open throttle while the transmission is in reverse for the Kramer vehicle, the reconstructed—at least my reconstructed impact speed at the house of 23 to 29 miles per hour would be about 13 to 19 miles per hour less than the vehicle was capable of when traveling over that distance and my conclusion is that this is more than consistent with some retardation due to brake application by Ms. Kramer. . . .

(Id. at 14:6–16:1.)

Defendant seeks to exclude Dr. Berg's opinions and testimony on four grounds. First, Defendant argues that Dr. Berg's hypothesis that drivers only make pedal errors if confronted with an unexpected hazard fails Daubert scrutiny because it is based only on a review of literature and no independent testing and, therefore, is unreliable. (Mem. in Supp. of Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of William Berg [Doc. No. 201] ("Def.'s Berg Mem."), at 7–11.) Second, Defendant asserts that Dr. Berg, as "a civil engineer whose expertise is in railroad and traffic pattern safety," is not qualified to render an opinion about vehicle design. (Id. at 12.) Third, Defendant contends that Dr. Berg's opinion regarding accident reconstruction is cumulative of the opinion of Ronald Kirk (another of Plaintiffs' expert witnesses) and is not based on any investigation or analysis sufficient to satisfy Rule 702. (Id. at 13–14.) Finally, Defendant argues that Dr. Berg's critique of government studies is only relevant if Defendant introduces those studies

and, at any rate, is inadmissible because the jurors are capable of assessing those studies without Dr. Berg's assistance. (Id. at 14–15.)

In response, Plaintiffs argue that "Dr. Berg applied a well-recognized human factors methodology" in rendering his opinion regarding lack of pedal error, (Pl.'s Mem. in Opp. to Def.'s Renewed Mot. in Limine to Exclude the Testimony of William Berg [Doc. No. 224] ("Pls.' Berg Opp."), at 4), and that reliability can be accomplished through the review of data generated by others in the field rather than independent testing, (see id. at 12). In addition, Plaintiffs state that Dr. Berg does not intend to testify about how an automobile functions or about design defects, but rather about reconstruction and human factors—areas in which he has extensive knowledge and experience. (Id. at 2–3.) As for Dr. Berg's reconstruction opinion, Plaintiffs argue that he presented his written calculations and ample detail regarding his methodology during his deposition, and, to the extent the opinion is duplicative of Mr. Kirk's opinion regarding the speed at impact, that issue can be resolved at trial. (Id. at 10.) Finally, Plaintiffs do not contest the fact that Dr. Berg's assessments of the government studies only become relevant "should they be introduced by Ford." (Id. at 17.) Plaintiffs do, however, assert that Dr. Berg is permitted to rely on the studies to support his own opinions, that he is qualified to present his assessments to the jury based on his prior completion of research studies, and that his opinion will be helpful to jury. (Id. at 16–17.)

As a preliminary matter, Plaintiffs have asserted that Dr. Berg will not testify about vehicle design. Accordingly, the only opinions at issue are Dr. Berg's opinions regarding human factors analysis and accident reconstruction, and the Court finds that these opinions are admissible. Both topics are subject matter areas in which Dr. Berg has demonstrated

experience and expertise.  Although Dr. Berg has not published his own research on human

factors analysis and driver pedal misapplication in particular, he did review a dozen

published research studies and articles regarding vehicle pedal configuration and driver

pedal errors in formulating his opinions regarding whether driver error is a likely cause of

sudden or unwanted acceleration incidents.  And, as discussed above, "an expert may

extrapolate from data supplied by other experts."  Larson, 414 F.3d at 941 (internal

quotation marks omitted).  To the extent that Defendant believes the studies and reports do

not support Dr. Berg's opinion, Defendant may challenge Dr. Berg on cross-examination.

See id. ("As a general rule, the factual basis of an expert opinion goes to the credibility of

the testimony, not the admissibility, and it is up to the opposing party to examine the factual

basis for the opinion in cross-examination.") (internal quotation marks omitted).

Moreover, should Defendant introduce or rely on the government studies upon which

Dr. Berg opines, Plaintiffs may elicit Dr. Berg's assessments of the reliability of those

studies in order to challenge their probative value.  See Kehm v. Procter & Gamble Mfg.

Co., 724 F.2d 613, 619–20 (8th Cir. 1983) (discussing the defendant's ability to present

expert testimony challenging the methodology of government reports relied on by the

plaintiff in order to attack the probative value of those reports).  Dr. Berg's critiques include

evaluations of the studies' "objectives, scope, [and] experimental design," including their

inclusion or exclusion of a causal factors analysis, (Carey-Berg Decl., Ex. D (Berg Report),

at 3), and, as such, are beyond the knowledge of a layman and would be helpful to the jury.

As for Dr. Berg's reconstruction opinion, Dr. Berg relied on the accident report,

photographs of the vehicle and accident scene, witness statements, and data from other

experts. His explanation of the calculations underlying his conclusion regarding the speed

of the subject vehicle at the point of impact with the house spans at least two pages of his

deposition transcript and—on its face—involves an application of physics and accident

reconstruction concepts to the circumstances of the subject accident. Thus, the Court finds

that Dr. Berg's opinion is based on sufficient facts or data. Again, while Dr. Berg may have

relied on some data created by another expert as a starting point for his calculations, such

reliance is permissible. See Larson, 414 F.3d at 941. And, to the extent that Defendant

believes the underlying facts do not support Dr. Berg's opinion, Defendant may challenge

Dr. Berg on cross-examination. See id.

Finally, although Dr. Berg's testimony regarding accident reconstruction may be

somewhat duplicative of Mr. Kirk's opinion regarding accident reconstruction, it is not

completely so given, for example, Dr. Berg's human factors analysis and additional

conclusion—based on the speed at impact—that Ms. Kramer was applying the brake while

traveling in reverse. (Compare Carey-Berg Decl., Ex. D (Berg Report), at 8–10, with

Carey-Berg Decl., Ex. E (Kirk Rep.), at 1–4.) Accordingly, the Court does not find, at this

stage of the proceedings, that the probative value of Dr. Berg's testimony is substantially

outweighed by its minimally cumulative nature. See Fed. R. Evid. 403 ("The court may

exclude relevant evidence if its probative value is substantially outweighed by a danger

of . . . needlessly presenting cumulative evidence."). For these reasons, the Court is not

persuaded that Dr. Berg's opinions and testimony should be excluded.

C.    **David Bilek**

Defendant next seeks to exclude the testimony and opinions of David Bilek.  Mr.

Bilek has a B.S. in mechanical engineering technology and over thirty years of experience

providing consulting services in the fields of mechanical and forensic engineering and

reconstructing automotive accidents involving a variety of vehicles.  (Pl.s' Mem. in Opp. to

Def.'s Mot. to Exclude the Testimony of D. Bilek, Ex. 1 (Bilek CV), at 1.)  Over the course

of his career, he has provided testimony in close to 100 trials and in more than 200

depositions.  (See Pls.' Mem. in Opp. to Def.'s Renewed Mot. in Limine to Exclude the

Testimony and Opinions of David Bilek [Doc. No. 229] ("Pl.'s Bilek Opp."), Ex. B (Bilek

Dep.), at 22:1-9.)

Relevant to this case, Mr. Bilek was "retained to evaluate and analyze materials

produced by Ford Motor Company (Ford) generally associated with other similar incidents

(OSI's) involving sudden unintended acceleration (SUA), and to evaluate Ford's practices

in tracking and responding to safety concerns of customers and dealerships."  (Carey Decl.

in Supp. of Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of

David Bilek [Doc. No. 207], Ex. C (Bilek Report), at 2.)  Included within the materials

reviewed by Mr. Bilek are documents from two of Defendant's internal databases:  the

Master Owners Relation System (MORS) and the Common Quality Indicator System

(CQIS).  (See id. at 3–4.)  According to Mr. Bilek, the MORS contains reports describing

communications between Ford vehicle owners and Defendant via a hotline, including at

least 152 reports of UA.  (Id. at 7.)  The CQIS, on the other hand, contains reports

describing communications between Ford dealership mechanics and Ford service

32

technicians over the Ford Technical Hotline regarding repair issues, including issues

involving potential UA. (Id. at 4–5.) Defendant produced roughly 80,684 CQIS reports,

and a key word search (using the terms "surge acceleration," "sudden acceleration,"

"unintended acceleration," and "accelerated") was used to identify "meaningful reports"

concerning the Grand Marquis, Crown Victoria, and Town Car vehicles (which are all part

of the Panther Platform) for model years 2005 to 2010. (Id. at 3–4.) Upon reviewing these

reports, Mr. Bilek discovered that Defendant had "preprogrammed a set response to

unintended acceleration" for the Ford service technicians to incorporate into their responses

to the mechanics:

- "Phrase 1": "Suspect customer is pressing both the brake pedal and accelerator pedal at the same time when coming to a stop or shifting into gear. Explain the redundant safety of the throttle by wire system to the customer. Check for interference from the floor mat. Do not attempt any repair until the concern can be duplicated. If necessary, install a VDR and have the customer get a recording of the event. Monitor TP1, TP2, APP1, APP2, APP3, Load, RPM, VSS, MAF voltage, and a brake input. If recording comes back with an APP input and a brake input, customer is pressing both pedals at the same time."

- "Phrase 2": "It may be possible that this condition is induced by inadvertently pressing both the brake pedal and the accelerator pedal at the same time when coming to a stop or shifting into gear. Please explain the redundant safety feature of the electronic throttle by wire system to the customer. Check for interference from the floor mat. No repair should be attempted until the concern can be duplicated. If necessary, install a VDR and have the customer get a recording of the event. Monitor TP1, TP2, APP1, APP2, APP3, Load, RPM, VSS, MAF voltage, and a brake input. If recording comes back with an APP input and a brake input, this indicates both pedals being pressed at the same time."

- "Phrase 3": "The technical hotline has not seen the Ford electronic throttle control system have a failure that causes the vehicle to accelerate by itself. The way this ETC system is designed and

> redundancies in place, if there is a fault (circuit-related, ETB-related, or APP-related) it will put the vehicle into failsafe mode (Failure Mode Effects Management – FMEM)."

(Id. at 5.) Using these phrases as additional search terms, and accounting for duplicates, Mr. Bilek purports to have identified 829 relevant CQIS reports, 184 of which involve police vehicles.  (Id. at 6.)  Based on the CQIS and MORS reports, Mr. Bilek concluded that:

> For years prior to the Kramer accident, based on the MORS and CQIS reports, Ford was aware of both the extent and the dangers of unintended acceleration in the Panther platform vehicles.
>
> . . . .
>
> Clearly there is a record to Ford of reported potential unintended acceleration events involving ETC occurring across product lines.  Based on safe engineering practice, and as acknowledged by the testimony of Raymond Nevi of Ford's Automotive Safety Office, the numbers generated to date should have been enough to prompt a "deeper dive" into the potential issue.

(Id. at 7–8.)

Defendant makes several arguments in support of excluding Mr. Bilek's opinions and testimony.  First, Defendant argues that Mr. Bilek's opinion is inadmissible because he did not, and Plaintiffs cannot, demonstrate that the "other incidents" that form the basis of his report are "substantially similar" to the subject incident.  (Mem. in Supp. of Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of David Bilek [Doc. No. 205] ("Def.'s Bilek Mem."), at 5–7.)  Second, Defendant argues that Mr. Bilek's testimony is inadmissible as expert testimony because it is not based on specialized knowledge or reliable scientific methodology as required by Federal Rule of Evidence 702.  (See id. at 8–10.)  Defendant contends that the methodology is flawed because Mr. Bilek did not know who reviewed the MORS/CQIS reports, did not provide them with a written procedure or

methodology, did not review the accuracy of the work performed, and did not verify the

accuracy of the information in the MORS/CQIS reports.  (See id. at 11–13.)  Third,

Defendant argues that, if Mr. Bilek is not offering opinion testimony, then he may only

testify as to matters of which he has personal knowledge, and he does not have personal

knowledge of the facts and circumstances underlying the reports.  (Reply Mem. in Supp. of

Def.'s Renewed Mot. in Limine to Exclude the Testimony and Opinions of David Bilek

[Doc. No. 244] ("Def.'s Bilek Reply"), at 2.)  Fourth, Defendant asserts that a summary of

the reports is inadmissible because the reports contain hearsay.  (Id. at 3–6.)  Even if the

reports and summary were admissible, however, Defendant contends that the jury is capable

of reading through those documents without Mr. Bilek's assistance and that allowing Mr.

Bilek to testify would usurp the role of the jury and would impermissibly lend an aura of

reliability to Plaintiffs' arguments.  (Id. at 10.)  Finally, Defendant argues that Mr. Bilek's

testimony is irrelevant because whether Defendant should have conducted an investigation

in response to the reports has no bearing on the elements of Plaintiffs' claims.  (Def.'s Bilek

Mem. at 13–15.)

In response, Plaintiffs argue that Mr. Bilek's testimony will not include opinions

reached by applying a scientific method, but rather will include a summary of Defendant's

own business records, and so is not subject to Daubert scrutiny.  (See Pl.'s Bilek Opp. at 1,

17.)  More specifically, Plaintiffs assert that "Mr. Bilek will not be opining that [the]

magnitude of these reports should have compelled Ford to do a 'deeper dive' into the

possibility of a deadly malfunction in these vehicles."  (Id. at 9.)  Plaintiffs also argue that

there is no example cited where Mr. Bilek's methodology resulted in the inclusion of

irrelevant MORS or CQIS reports, and that the reports themselves are not hearsay because

they are party admissions, are not being offered for the truth of the matter asserted, and are

business records.  (See id. at 9–11.)  Finally, Plaintiffs argue that not only is uniformity of

other incidents not required, but that Ford has admitted that the Panther Platform vehicles

for model years 2005 to 2010 are substantially similar.  (See id. at 11–12.)  And, according

to Plaintiffs, Mr. Bilek's testimony regarding these other incidents is relevant to whether

Defendant had notice of a potential defect in the subject vehicles (i.e., an element of

Plaintiffs' claims for failure to warn and design defect), causation, and punitive damages.

(See id. at 12, 16, 19–21.)

   The Court finds that Mr. Bilek's testimony regarding his summary of the MORS and

CQIS reports, as well as the reports and the summary themselves, are admissible.  First,

"Rule 1006 states that the contents of voluminous writings which cannot be conveniently

examined in court may be presented in the form of a summary or calculation."  Ford Motor

Co. v. Auto Supply Co., 661 F.2d 1171, 1175 (8th Cir. 1981).  And, the person who

prepares such a summary may testify as to the origin of its contents and the resulting

summary.  See id. (noting that the defendant's witness, who prepared a summary of sales

and costs based on the defendant's business records, "testified in detail [at trial] concerning

the origin of the figures and summary"); United States v. Hill, 604 F. App'x 759, 783–84

(10th Cir. 2015) (finding no abuse of discretion in the district court permitting a police agent

who summarized subpoenaed cell phone records to present his summary diagram and to

testify as a fact witness about the findings of his investigation because he testified only

about the facts contained in the records and did not offer opinions).  Here, the 829 reports at

issue are too voluminous to be reviewed in court, and Plaintiffs have stated that Mr. Bilek

will simply discuss his search and summary of Defendant's business records and will not

offer an opinion that the reports should have caused Defendant to take action. Accordingly,

the summary of the records is admissible under Rule 1006, and Mr. Bilek's testimony is not

subject to Rule 702 or <u>Daubert</u> because he is not offering an expert opinion.[7]  Moreover,

allowing Mr. Bilek to testify regarding his compilation of the data and the results will assist

the jury in understanding the data, rather than act to usurp the jury's role.  To the extent that

Defendant is concerned that Mr. Bilek will lend unwarranted credibility to Plaintiffs'

arguments, Defendant may challenge his credibility and methodology on cross-examination.

Second, Defendant does not deny that the MORS/CQIS reports themselves fall

within the business records exception to the hearsay rule, <u>see</u> Fed. R. Evid. 803(6), but

rather Defendant argues that the consumer complaints within the reports constitute

inadmissible hearsay.  (<u>See</u> Def.'s Bilek Reply at 5.)  However, because Plaintiffs do not

intend to offer the recitations of the customer complaints for the truth of the assertions, but

instead to show Defendant's notice of the alleged problem, those customer complaints are

not hearsay.  <u>See</u> Fed. R. Evid. 801(c) ("'Hearsay' means a statement that:  (1) the declarant

does not make while testifying at the current trial or hearing; <u>and</u> (2) a party offers in

evidence <u>to prove the truth of the matter asserted</u> in the statement.") (emphases added).

---

[7]    Plaintiffs note that, in December 2010, Mr. Bilek provided trial testimony
regarding his summary of Defendant's MORS and CQIS reports in <u>Schanel v. Ford
Motor Co.</u> (Civ. Action No. 2010CV116), an unintended acceleration case that was
pending in Colorado state court. (Pls.' Bilek Opp. at 9.)  According to the trial transcript,
the court in that case allowed Mr. Bilek to testify as an expert in the field of forensic
engineering.  (<u>Id.</u>, Ex. 8 (<u>Schanel</u> Trial Tr.) at 861:15–862:1.)

Third, the other incidents that form the basis of the reports are sufficiently similar to the subject incident to be admissible. Whether to admit evidence of other incidents is within the discretion of the trial court, but "the proponent of the evidence must show that the facts and circumstances of the other incident are substantially similar to the case at bar." Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496, 508 (8th Cir. 1993). Here, Defendant asserts that Plaintiffs are unable to establish that the consumer complaints, for example, relate to incidents that were caused by the same defect, took place under similar road and vehicle conditions, occurred while the vehicles at issue were traveling in reverse, or resulted in an accident. (See Def.'s Bilek Mem. at 5–7.) However:

> "[t]here are no hard or fast rules as to what degree of similarity there must be to make the evidence admissible. If there is no similarity of conditions, then the evidence would be inadmissible. If there is some similarity of conditions, the weight of that evidence would be in proportion of the evidence of similarity, the greater weight to be given where there is greater similarity and the lesser weight where the similarity is less."

Henwood v. Chaney, 156 F.2d 392, 397 (8th Cir. 1946) (quoting Lever Bros. v. Atlas Assur. Co., 131 F.2d 770, 777 (7th Cir. 1942)). The consumer complaints at issue in this case all relate to vehicles from the Panther Platform from model years 2005 to 2010 (which have the same ETC system, as discussed above) and to consumers who experienced an acceleration event (like Ms. Kramer). The Court finds that these circumstances render the other incidents substantially similar to the subject incident to be admissible, and Defendant will have the opportunity on cross-examination to argue that the evidence is not persuasive by pointing out dissimilarities. See, e.g., Lewy v. Remington Arms Co., 836 F.2d 1104, 1108

(8th Cir. 1988); <u>Kehm</u>, 724 F.2d at 626 (citing <u>Henwood</u>, 156 F.2d at 397) ("It was up to the jury to decide what weight to give the complaints from other consumers.").

Fourth, these other incidents are relevant. Pursuant to Federal Rule of Evidence 401, "[e]vidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  In the product liability context, "evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, . . . the standard of care, and causation.'" <u>Kehm</u>, 724 F.2d at 625 (quoting <u>Ramos v. Liberty Mut. Ins. Co.</u>, 615 F.2d 334, 338–39 (5th Cir. 1980)).  More specifically, "a manufacturer's notice of other accidents addresses whether [the] manufacturer exercised sufficient care to eliminate any unreasonable risk of harm from foreseeable uses of its product at the time of design"—one element of a defective design claim.  <u>See</u> <u>Sanny v. Trek Bicycle Corp.</u>, Civ. No. 11-2936 (ADM/SER), 2013 WL 1912467, at *3, *6 (D. Minn. May 8, 2013) ("Minnesota courts use a 'reasonable care' balancing test to determine whether a product is defective," under which "a product is unreasonably dangerous, and thus defective, if the manufacturer . . . fails to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use").  And, to the extent that other incidents are relevant to notice, they also are relevant to the issue of punitive damages.  <u>Lewy</u>, 836 F.2d at 1108.

Here, the fact that there were dozens of reports of substantially similar incidents of UA is relevant to whether Defendant exercised sufficient care to eliminate a risk of harm. The fact that those incidents were allegations—rather than proven incidents—does not make the reports irrelevant but instead goes to whether the risk of harm was unreasonable. Accordingly, to the extent that Plaintiffs seek to introduce the reports, summary, and Mr. Bilek's testimony to demonstrate that Defendant had notice of a potential defect in the subject vehicle, that evidence is relevant to Plaintiffs' claims for design defect and punitive damages.[8]

Finally, while it is true that a witness may only testify as to matters of which he has personal knowledge, see Fed. R. Evid. 602, Mr. Bilek has personal knowledge of his summary of the MORS/CQIS reports and, based on his review of those reports, of their contents. To the extent that Defendant wishes to challenge Mr. Bilek's credibility or the reliability of his search methodology and results, Defendant may do so on cross-examination. For these reasons, the Court is not persuaded that Mr. Bilek's opinions and testimony should be excluded.

## IV.    MOTION FOR SUMMARY JUDGMENT

As discussed above, Plaintiffs assert eight causes of action against Defendant: strict liability for defective design (Count I), strict liability for failure to warn (Count II), negligent design (Count III), negligent failure to warn (Count IV), breach of warranty (Count V), negligence per se (Count VI), consumer fraud (Count VII), and loss of

---

[8]    While notice also would be relevant to Plaintiffs' claims for failure to warn, those claims are being dismissed on summary judgment, as discussed below.

consortium (Count VIII). (Am. Compl. ¶¶ 1, 13–49.) Defendant moves for summary judgment on these claims on the grounds that there is no evidence of a defect in the subject vehicle or any Ford vehicle that did or could cause the alleged UA, Ms. Kramer never read the warnings that accompanied the vehicle, and Plaintiffs have not identified any fraud or misrepresentation that caused their damages or proven that their claims are asserted for the public benefit. (See Mem. in Supp. of Def.'s Renewed Mot. for Summ. J. [Doc. No. 191] (filed under seal) ("Def.'s SJ Mem."), at 1–3.)

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson, 477 U.S. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is

a genuine issue for trial," Anderson, 477 U.S. at 256.  Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

As discussed herein, the Court finds that Defendant is entitled to summary judgment as to Counts II, IV, VI, and VII.  However, Plaintiffs may proceed to trial on Counts I, III, V, and VIII.

### A.   Design Defect Claims

In Counts I, III, and V, Plaintiffs assert claims for strict liability for defective design, negligent design, and breach of warranty based on defective design,[9] respectively.

---

[9]     In their breach of warranty claim, Plaintiffs assert:

35.     Ford, in connection with its business activities or through its authorized dealers and agents, warranted and represented, expressly and impliedly, that the subject vehicle was reasonably fit, safe, capable, and of merchantable quality.  It implicitly promised that the subject vehicle would not accelerate without a signal from the driver; that it would stop accelerating upon the driver's removal of pressure from the accelerator pedal; and that it would slow and stop upon reasonable application of force to the brake.

36.     Contrary to those representations and warranties, the subject vehicle was unsafe, unreasonably dangerous, not of merchantable quality, and unsuitable for its intended purpose in that it was susceptible to sudden, unintended acceleration without driver input; in that it lacked adequate warnings about the possibility of sudden acceleration and instructions of what to do should sudden

More specifically, Plaintiffs claim that the design of the subject vehicle was defective in that: (1) its ETC system is susceptible to UA; (2) it does not include a failsafe mechanism capable of preventing or terminating UA; (3) it was not equipped with a brake override system; and (4) application of the brake pedal while the throttle is in an open position reduces the vacuum available to the braking system. (Am. Compl. ¶¶ 14, 16, 17, 20; see id. ¶¶ 26, 35, 36.)

"Minnesota law merges negligence, design defect, and breach of warranty claims under a unified theory of strict product liability." Rosholt v. Blaw-Knox Constr. Equip. Corp., No. 04-CV-1181 (JMR/FLN), 2006 WL 839505, at *2 (D. Minn. Mar. 29, 2006) (citing Bilotta v. Kelley Co., 346 N.W.2d 616, 623 (Minn. 1984)). Thus, to survive summary judgment on these claims, a plaintiff must demonstrate the existence of a genuine issue of material fact as to whether: (1) the product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when the product left

---

acceleration occur; and in that braking effectiveness was impaired during open throttle.

(Am. Compl. ¶¶ 35–36.) Plaintiffs, however, have pointed to no express warranty to support this claim. Accordingly, that portion of the claim fails. To the extent that Plaintiffs rely on a theory of implied warranty, there are two types: merchantability and fitness. Piotrowski v. Southworth Prods. Corp., 15 F.3d 748, 751 (8th Cir. 1994). The former, which requires that goods be fit for their ordinary use, "is analogous to the theory of strict liability for design defect." Id. The latter, which requires that goods be fit for the particular purpose for which they are required, "is similar to an express warranty, where statements or representations may provide grounds for imposing liability even if the product is not defective in the sense of a design defect." Id. As already discussed, Plaintiffs have put forth no evidence of statements or representations that provide grounds for imposing liability. Therefore, to the extent that Plaintiffs' claim is based on the implied warranty of fitness, it fails. And, to the extent that it is based on the implied

the defendant's control; and (3) the defect was the proximate cause of the plaintiff's injury. Bilotta, 346 N.W.2d at 623 n.3. Here, Defendant argues that Plaintiffs' claims fail because Plaintiffs have presented no admissible evidence that the subject vehicle was defective or unreasonably dangerous, or that a defect caused the incident. (Def.'s SJ Mem. at 12.)

### 1.   Defective condition

Defendant first argues that Plaintiffs' defective design claims fail because Plaintiffs have no evidence of a defect in the subject vehicle. (Id.) Defendant asserts that expert testimony is necessary to establish the existence of a defect when a product is complex and that none of Plaintiffs' experts were able to identify a defect. (Id. at 12–13.) In regard to the lack of a brake override system, in particular, Defendant argues that Mr. Hannemann's opinion is unreliable and irrelevant for the reasons discussed above in Part III.A., and that even if it was admissible, Mr. Hannemann concedes that a vehicle is defective for failure to have a brake override system only if it is susceptible to UA, which the subject vehicle is not. (See id. at 14–16.)

In opposition, Plaintiffs claim that there is "overwhelming" evidence of a defect— specifically, vulnerability to UA—in the subject vehicle, as described by Ford's own documents (including the FMEA, an internal Ford white paper discussing a proposed change in accelerator pedal sensor suppliers, the NHTSA Presentation, and the MORS/CQIS reports) and Dr. Hubing's research. (Pls.' SJ Opp. at 19.) In addition,

---

warranty of merchantability, it is merged with the strict liability for defective design claim discussed above.

Plaintiffs raise the same defenses regarding Mr. Hannemann's opinions and testimony that they raised in opposition to Defendant's motion to exclude his testimony. (See id. at 29–35.)

Setting aside the FMEA (for the reasons discussed below in regard to Plaintiffs' failure to warn claims) and the MORS/CQIS reports (because, as discussed above, they are admissible only on the issue of notice), the Court finds that there is sufficient evidence to raise a genuine issue for trial as to whether there was a defect in the subject vehicle. Most importantly, the Court already has deemed admissible Mr. Hannemann's opinions regarding the 2005 Lincoln Town Car ETC system's susceptibility to UA and the lack of a brake override system. To the extent that the white paper and NHTSA Presentation also indicate defects in the subject vehicle's design, those documents also create a fact issue.

Defendant's reliance on Fireman's Fund Insurance Co. v. Canon U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005), to the contrary does not mandate a different result. In that case, the plaintiff alleged that a defective safety device in the heater control circuitry in a copier manufactured by the defendant failed to prevent a fire. Id. at 1057–58. In affirming summary judgment for the defendant, the Eighth Circuit stated:

> [T]he [plaintiff's] experts admitted that the heater control circuitry would have to malfunction in order to supply enough electrical current to the heating element to start a fire. However, the experts advanced no theory or experiment showing how the heater control circuitry could malfunction to produce such a current. Without evidence to show that the heater control circuitry could malfunction in such a way as to start a fire, [the plaintiff] cannot show that a defectively designed thermal fuse failed to prevent that fire. Therefore, even if the expert opinions had been admissible, we

45

> conclude that [the plaintiff] produced no evidence from which a reasonable
> jury could find that the allegedly defective thermal fuse caused the fire.

Id. at 1061.  Although Defendant argues that Plaintiffs' claim likewise fails because Mr.

Hannemann provides no evidence of a malfunction in the ETC system that could cause

UA and so cannot show that the vehicle was defective for failure to contain a brake

override in the event of UA, (see Def.'s SJ Mem. at 15–16), Mr. Hannemann's opinion

constitutes evidence that a fault in the subject vehicle's ETC system could have caused UA

and that, had a brake override system been included, the accident could have been

prevented.  Accordingly, Fireman's Fund is inapposite, and Plaintiffs have raised a genuine

issue for trial as to whether there was a defect in the design of the subject vehicle.

### 2.    Unreasonably dangerous

Defendant next argues that Plaintiffs' defective design claims fail because

Plaintiffs have no evidence that the subject vehicle was unreasonably dangerous.  (Def.'s

SJ Mem. at 16.)  "To determine whether there is enough evidence to submit the claim to a

jury, the court must balance 'the likelihood of harm, and the gravity of harm if it happens,

against the burden of the precaution which would be effective to avoid the harm.'"

Young, 428 F.3d at 789 (quoting Bilotta, 346 N.W.2d at 621).  "An important factor in

this balancing test is the availability of a feasible, safer alternative design."  Id. (citing

Kallio v. Ford Motor Co., 407 N.W.2d 92, 96 (Minn. 1987) (en banc)).

Defendant asserts that, because Plaintiffs have presented no evidence of a defect in

the vehicle, they cannot establish the likelihood or gravity of any harm due to a defect, or

the burden of any precaution that could eliminate such harm.  (Def.'s SJ Mem. at 16–17.)

46

Defendant also argues that Plaintiffs have failed to put forth evidence of a feasible, safer alternative design because Mr. Hannemann's opinion regarding a brake override system is inadmissible.  (See id. at 17–18.)

In response, Plaintiffs state that the FMEA, white paper, NHTSA Presentation, MORS/CQIS reports, and Ms. Kramer's testimony are evidence that the 2005 Lincoln Town Car is unreasonably dangerous.  (Pls.' SJ Opp. at 23.)  Plaintiffs also assert that the feasibility of the proposed alternative design in this case—i.e., the brake override system—already has been established by Defendant through incorporation into its vehicles and by the industry as evidenced by the prevailing industry standard in 2005.  (See id. at 31, 33.)  According to Plaintiffs, "[t]hat Ford now includes [the full-time brake override system] on virtually all its products proves that this safety feature is feasible, is generally accepted, and does not impair the vehicle's utility," and so Mr. Hannemann's opinion regarding the brake override system is admissible to show that the subject vehicle was unreasonably dangerous.  (Id. at 33.)

For the reasons discussed above in Part III.A, Mr. Hannemann's opinions regarding an alleged defect in the subject vehicle's ETC system and regarding the brake override system are admissible and, as such, provide evidence of a defect in the subject vehicle and of a feasible, safer alternative design.  Accordingly, the Court finds that Plaintiffs have presented sufficient evidence to submit to a jury the issue of whether the subject vehicle was unreasonably dangerous.

### 3.   Causation

Finally, Defendant argues that Plaintiffs' design defect claims fail because Plaintiffs' only evidence of causation—i.e., that an incident occurred—is insufficient as a matter of law.  (Def.'s SJ Mem. at 21.)  Defendant asserts that, instead, Plaintiffs must relate the alleged defect to the injury, and that Plaintiffs have not done so because there is no evidence of a defect in the vehicle.  (Id. at 20–21.)

"A plaintiff must do more than show that an accident occurred and provide a plausible explanation for the accident" in order to survive summary judgment on the issue of causation in a products liability case.  Hammes v. Yamaha Motor Corp. U.S.A., Inc., Civ. File No. 03-6456 (MJD/JSM), 2006 WL 1195907, at *12 (D. Minn. May 4, 2006) (citing Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1009 (8th Cir. 1998)).  For example, in Trost v. Trek Bicycle Corp., the Eighth Circuit affirmed summary judgment in favor of the defendant where the plaintiff's only evidence of causation was that his bike accident would not have happened if the bicycle had not been defective.  162 F.3d at 1009.  On the other hand, in Hammes v. Yamaha Motor Corp. U.S.A., Inc., the court determined that the plaintiff had presented sufficient evidence that the throttle on his motorcycle malfunctioned and caused his injuries where:  (1) he testified that the throttle stuck, (2) a witness's testimony that the engine continued to rev after the accident occurred was consistent with the theory that the throttle stuck, (3) the plaintiff's expert explained how the throttle's design made it possible for the throttle to malfunction, (4) the product contained markings consistent with the malfunction that allegedly

occurred, and (5) a subsequent user of the product testified that the throttle stuck on a different occasion. 2006 WL 1195907, at *12.

Like the plaintiff in Hammes, Plaintiffs here have provided sufficient evidence of causation to raise a genuine issue for trial. For example, Mr. Hannemann's expert opinion explains that the subject vehicle was subject to UA and that the lack of a brake override system made it possible for the vehicle to continue to accelerate without Ms. Kramer's input and cause the accident. In addition, Ms. Kramer's testimony that the vehicle continued to accelerate despite her act of pressing the brake pedal describes UA, and Dr. Berg's opinion that there is no basis to conclude that the UA event was caused by driver error or a pedal misapplication supports that testimony. Accordingly, Defendant is not entitled to summary judgment on Plaintiffs' design defect claims.

## B.    Failure to Warn Claims

In Counts II and IV, Plaintiffs assert causes of action for strict liability for failure to warn and negligent failure to warn, respectively. Strict liability and negligent failure to warn claims are analyzed under the same standard. Johnson v. Zimmer, 02–CV–1328 (JRT/FLN), 2004 WL 742038, *9, n.8 (D. Minn. Mar. 31, 2004) (citing Bilotta, 346 N.W.2d at 622). A plaintiff must establish the following under Minnesota law: "(1) the defendants had reason to know of the dangers of using the product; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries." Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir. 2004) (citing Erickson v. Am. Honda Motor Co., 455 N.W.2d 74, 77–78 (Minn. Ct. App. 1990) (quotations omitted)).

Although the adequacy of a warning typically is a question for the jury, a manufacturer's failure to warn is not the cause of an injury where an adequate warning could not have prevented the injury. Johnson, 2004 WL 742038, at *9 (citing Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987)). Thus, absent evidence that the plaintiff read the warnings accompanying a product or evidence that the plaintiff would have acted differently if new or additional warnings were provided, there is no causal link between the alleged defect and the injury and summary judgment is appropriate. See Tuttle, 377 F.3d at 924–25 (affirming summary judgment on the plaintiff's failure to warn claim for lack of causation because there was no affirmative evidence that any warnings would have been heeded); CIC Partners v. Sunbeam Prods., Inc., Civ. No. 09-3274 (SRN/SER), 2012 WL 124982, at *12–13 (D. Minn. Jan. 17, 2012) (granting summary judgment on the plaintiffs' failure to warn claim because the plaintiffs did not present evidence that they read the warnings accompanying the product or evidence that they would have acted differently if they had been provided with different or additional warnings); J&W Enters., Inc. v. Economy Sales, Inc., 486 N.W.2d 179, 181 (Minn. Ct. App. 1992) (affirming summary judgment on the plaintiff's failure to warn claim because there was no dispute that the plaintiff had not read the warning and, "[a]bsent a reading of the warning, there is no causal link between the alleged defect and the injury"); Yennie v. Dickey Consumer Prods., Inc., No. C1–00–89, 2000 WL 1052175, at *2 (Minn. Ct. App. Aug. 1, 2000) (affirming summary judgment based on insufficient evidence of causation in a failure to warn case because there was no evidence that the plaintiff had read the warning affixed to the product or that he would have heeded a more detailed warning if

one had been provided); see also Johnson v. Niagara Mach. & Tool Works, 666 F.2d

1223, 1225 (8th Cir. 1981) (stating that "an issue as to the adequacy of a warning

necessarily presupposes that the operator has read the warning," and affirming entry of a

directed verdict for the defendant on the plaintiff's failure to warn claim because the

evidence demonstrated that the plaintiff had not read the warning affixed to the product);

Hauenstein v. Loctite Corp., 347 N.W.2d 272, 276 (Minn. 1984) ("If the jury . . .

concluded that [the plaintiff] would not have acted differently even if there was a

warning, they were correct in concluding that [the defendant's] negligent failure to warn

was not the cause of [the plaintiff's] injury.").

      Here, Plaintiffs allege that:

> Ford had a duty to exercise reasonable care to provide adequate warnings to
> users of the subject vehicle of the risk that the vehicle could suddenly and
> rapidly accelerate without driver input; that braking would be impeded
> during such an event; and, additionally, to advise of the measures a driver
> should take to decrease the possibility of a crash should sudden acceleration
> occur. Ford provided no such warnings or instructions.

(Am. Compl. ¶¶ 23, 31.) Defendants challenge Plaintiffs' claim only on the issue of

causation. (Reply in Supp. of Def.'s Renewed Mot. for Summ. J. [Doc. No. 242] (filed

under seal), at 11.) Defendants argue that causation is lacking because Ms. Kramer

confirmed that she never read any literature pertaining to the subject vehicle and because

there is no evidence that she would have changed her behavior had an additional warning

been provided. (Def.'s SJ Mem. at 22–23.) Plaintiffs, on the other hand, argue that the

issue is not whether Defendant provided owners with an "adequate warning," but whether

Defendant had a legal duty to provide owners with instructions on how to handle UA

given what it knew about the 2005 Lincoln Town Car's history of UA.  (Pls.' SJ Opp. at 25.)

The Court agrees with Defendant that causation is lacking.  Not only did Ms. Kramer confirm that she never saw the owner's manual for the subject vehicle and never reviewed any literature or information about the vehicle prior to her accident, but Plaintiffs also failed to put forth any evidence that Ms. Kramer would have altered her behavior had Defendant provided her with additional information or warnings—including about UA. Because there is no evidence that an adequate warning could have prevented Ms. Kramer's injuries, there is no causal link between Defendant's failure to warn and Ms. Kramer's injuries.  Accordingly, Ms. Kramer has failed to create a genuine issue of material fact regarding an essential element of her failure to warn claims, and Defendant is entitled to summary judgment on Counts II and IV.

## C.     Negligence Per Se

In Count VI, Plaintiffs assert a cause of action for negligence per se.  "'Negligence per se is a form of ordinary negligence that results from violation of a statute.'" Anderson v. Minn. Dep't of Natural Res., 693 N.W.2d 181, 189 (Minn. 2005) (quoting Seim v. Garavalia, 306 N.W.2d 806, 810 (Minn. 1981)).  In other words, "'a statutory standard of care [is substituted] for the ordinary prudent person standard of care, such that a violation of a statute . . . is conclusive evidence of duty and breach.'"  Id. at 189–90 (quoting Gradjelick v. Hance, 646 N.W.2d 225, 231 n.3 (Minn. 2002)).

In this case, Plaintiffs allege that the subject vehicle failed to conform to Federal

Motor Vehicle Safety Standard 124, 49 C.F.R. § 571.124 ("FMVSS 124"). (Am. Compl.

¶ 39.) FMVSS 124 states:

> S5. Requirements. The vehicle shall meet the following requirements when the engine is running under any load condition, and at any ambient temperature between −40 degrees Celsius and +52 degrees Celsius after 12 hours of conditioning at any temperature within that range.
>
> > S5.1 There shall be at least two sources of energy capable of returning the throttle to the idle position within the time limit specified by S5.3 from any accelerator position or speed whenever the driver removes the opposing actuating force. In the event of failure of one source of energy by a single severance or disconnection, the throttle shall return to the idle position within the time limits specified by S5.3, from any accelerator position or speed whenever the driver removes the opposing actuating force.
> >
> > S5.2 The throttle shall return to the idle position from any accelerator position or any speed of which the engine is capable whenever any one component of the accelerator control system is disconnected or severed at a single point. The return to idle shall occur within the time limit specified by S5.3, measured either from the time of severance or disconnection or from the first removal of the opposing actuating force by the driver.
> >
> > S5.3 Except as provided below, maximum time to return to idle position shall be 1 second for vehicles of 4536 kilograms or less GVWR, and 2 seconds for vehicles of more than 4536 kilograms GVWR. Maximum time to return to idle position shall be 3 seconds for any vehicle that is exposed to ambient air at −18 degrees Celsius to −40 degrees Celsius during the test or for any portion of the 12–hour conditioning period.

49 C.F.R. § 571.124. Plaintiffs claim that "the subject vehicle should have been designed

so that the throttle would return to idle within one second after the driver signals his or

her intention to remove actuating force from the throttle." (Am. Compl. ¶ 39.)

Defendant argues that Count VI must be dismissed because Plaintiffs' expert, Mr. Hannemann, testified that the subject vehicle complies with FMVSS 124 and because Plaintiffs have failed to present any evidence that the vehicle violated any other statute, ordinance, or regulation. (Def.'s SJ Mem. at 24.) Plaintiffs, in response, argue that the FMEA for the 2005 Lincoln Town Car, Ms. Kramer's testimony, and the "countless sudden accelerations reported to Ford" create a jury question on this issue. (Pls.' SJ Opp. at 27–28.)

The Court agrees with Defendant. A determination of whether the 2005 Ford Lincoln Town Car complied with FMVSS 124 would require the aid of expert testimony, and the only expert testimony cited by either party regarding this safety standard is that of Plaintiffs' expert who testified that the 2005 Lincoln Town Car does comply. (Carey SJ Decl., Ex. 6 (Hannemann Dep.), at 156:10-12.) Thus, not only does Plaintiffs' argument that the FMEA identifies various failure modes that violate FMVSS 124 directly contradict their expert's opinion, but they cite to no support for their argument. And, given the highly technical nature of the FMEA, the Court does not find Plaintiffs' counsel's interpretation of that document to be sufficient to create a genuine issue of material fact. Similarly, without the aid of expert testimony to tie Ms. Kramer's testimony to a violation of FMVSS 124, her testimony also is insufficient to create an issue for trial. Finally, because the evidence of other incidents of UA is admissible only to show notice, it cannot be used to show that a violation of FMVSS 124 occurred. For these reasons, Defendant is entitled to summary judgment on Count VI.

**D.    Minnesota Consumer Fraud Act**

Plaintiffs' Count VII asserts a claim under the Minnesota Consumer Fraud Act

("MCFA") on the grounds that, in connection with the sale of the subject vehicle,

Defendant represented that the vehicle had certain characteristics that it did not have and

concealed the vehicle's propensity to experience UA. (Am. Compl. ¶ 43.)  The MCFA

prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false

promise, misrepresentation, misleading statement or deceptive practice, with the intent

that others rely thereon in connection with the sale of any merchandise, whether or not

any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat.

§ 325F.69, Subd. 1.  The MCFA does not provide for a private right of action to

individual consumers, but private citizens may bring a claim through the Private Attorney

General Act if they can "demonstrate that their cause of action benefits the public."  Ly v.

Nystrom, 615 N.W.2d 302, 314 (Minn. 2000); see Minn. Stat. § 8.31, Subd. 3a; Minn.

Stat. § 325F.70, Subd. 1.  "To determine whether a lawsuit is brought for the public

benefit the Court must examine not only the form of the alleged misrepresentation, but

also the relief sought by the plaintiff."  Zutz v. Case Corp., No. Civ. 02-1776

(PAM/RLE), 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003).  "Where recovery is

sought for the exclusive benefit of the plaintiff, there is no public benefit."  Id.

Defendants argue that Plaintiffs' MCFA claim must be dismissed because:

(1) Plaintiffs have not identified any fraud, misrepresentation, or deceptive practice;

(2) Plaintiffs have not demonstrated that the claim was brought for the public benefit; and

(3) Plaintiffs have not established a causal connection between any alleged fraud and

their injuries.  (See Def.'s SJ Mem. at 25–29.)  In opposition, Plaintiffs claim that

Defendant's use of data recorders to "falsely accuse police officers of negligently causing

life-endangering automotive behavior" is fraudulent, misleading, and deceptive. (Pls.' SJ

Opp. at 28–29.)  They also assert that "[i]t is self-evident that the public has a compelling

interest in automotive safety, and the unlawful concealment of a dangerous safety defect

is palpably against the public interest."  (Id. at 28.)

      The Court agrees with Defendant that Plaintiffs' claim fails as a matter of law

because they have not demonstrated that it was brought to benefit the public.  Rather,

"the essence of Plaintiffs' lawsuit is personal injury, involving allegations of negligence

and products liability," and Plaintiffs seek compensatory damages for lost earnings,

medical and life care expenses, pain and suffering, and emotional distress —"[s]uch

damages do not benefit the public."  Pecarina v. Tokai Corp., No. CUV, 01-1655

(ADM/AJB), 2002 WL 1023153, at *5 (D. Minn. May 20, 2002); see, e.g., King v. Reed,

LLC, Civ. No. 07-1908 (DWF/RLE), 2008 WL 80630, at *4 (D. Minn. Jan. 8, 2008)

(dismissing the plaintiff's MCFA claim because the lawsuit was "primarily a products

liability and negligence case" and "[a]ny award would merely benefit [the plaintiff]");

Overen v. Hasbro, Inc., Civ. No. 07-1430 (RHK/JSM), 2007 WL 2695792, at *3 (D.

Minn. Sept. 12, 2007) (dismissing the plaintiff's MCFA claim because the plaintiff

sought money damages to compensate for personal injury and did not seek "any sort of

injunctive relief that would alter the practices or actions of [the defendant] such that it

would serve a public benefit").  Thus, while it may be true that the public has an interest

in automotive safety, as Plaintiffs assert, "[a] successful prosecution of [Plaintiffs'] claim

does not advance state interests and enforcement has no public benefit." Ly, 615 N.W.2d

at 314. Accordingly, Count VII fails as a matter of law and must be dismissed.

### E.    Loss of Consortium

Finally, Defendant argues that Plaintiffs' loss of consortium claim in Count VIII

must be dismissed because it is derivative of the underlying product liability claims,

which Plaintiffs cannot prove. (Def.'s SJ Mem. at 29 n.7.) Because the Court finds that

Defendant is not entitled to summary judgment on Plaintiffs' design defect claims,

Defendant also is not entitled to summary judgment on the loss of consortium claim.

## V.    MOTION TO PRESERVE CONFIDENTIAL DESIGNATION

In its Renewed Motion to Preserve Confidential Designation, Defendant seeks an

order pursuant to Federal Rule of Civil Procedure 26(c) preserving the confidentiality of

the NHTSA Presentation. (See Def.'s Renewed Mot. to Preserve Confidential

Designation Pursuant to Protective Order [Doc. No. 208], at 1.) Each page of this

document, produced by Defendant during the course of this litigation, is marked

"Confidential Subject to Protective Order," (see Wichelman Decl., Ex. 1 (NHTSA

Presentation)), and it was accorded confidential status by NHTSA for a period of ten

years, (see Engle Decl. [Doc. No. 212] ¶ 6 & Ex. A). After Plaintiffs challenged the

confidentiality of the document, Defendant acknowledged that several of the pages have

previously been made public. (See Def.'s Supplemental Br. in Supp. of Renewed Mot. to

Preserve Conf. Desig. Pursuant to Protective Order [Doc. No. 248] ("Def.'s Supplemental

Conf. Desig. Mem."), at 2.) Thus, the Court will address Defendant's arguments only in

regard to those pages of the NHTSA presentation that have not previously been made public: 1, 2, 5, 7, 9, 16, 18, 20, 22–29, and 31.  (See id.)

Under Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G).  "Whether trade secrets are involved or not, and whether their revelation will cause damage to someone, are questions of fact, to be decided [by the court] after receiving evidence." In re Iowa Freedom of Info. Council, 724 F.2d 658, 663 (8th Cir. 1984).

That being said, there is a common law right of access to judicial records. Webster Groves Sch. Dist. v. Pulitzer Publ'g Co., 898 F.2d 1371, 1376 (8th Cir. 1990). That right "is not absolute, but requires a weighing of competing interests." Id. Thus, the presumption of public access may be overcome with a showing of "'compelling reasons,'" Healey v. I–Flow, LLC, 282 F.R.D. 211, 214 (D. Minn. 2012) (quoting In re Neal, 461 F.3d 1048, 1053 (8th Cir. 2006)), as determined after consideration of:

> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

Schedin v. Ortho–McNeil–Janssen Pharms., Inc., Civ. No. 08–5743(JRT), 2011 WL 1831597, at *1–2 (D. Minn. May 12, 2011).  The burden to overcome the presumption is

heightened when the documents at issue are filed in connection with a merits-based motion. Healey, 282 F.R.D. at 214. Ultimately, however, the decision to seal a file is within the court's discretion. Webster Groves Sch. Dist., 898 F.2d at 1376.

Relying on declarations submitted by Ford engineer James Engle, Defendant argues that the NHTSA Presentation contains confidential business information that constitutes trade secrets. (See Def.'s Supplemental Conf. Desig. Mem. at 4.) Redaction

According to Mr. Engle, this information is obtained at great expense to Defendant—costing up to hundreds of thousands of dollars and taking several years—and is provided only to those employees within Ford whose job duties require their knowledge of the information. (Engle Decl. ¶¶ 9, 12–13.) The information is treated as highly confidential within Ford because it provides insight into Defendant's current product design and operation, as well as future product development. (See id. ¶ 12; Engle Supplemental Decl. ¶¶ 7, 10.) If one of Defendant's suppliers or competitors were to obtain such information, those entities could use it to their competitive advantage in price negotiations or by getting a similar product to market sooner or at a lower cost. (Engle Supplemental Decl. ¶¶ 8–9, 11–12.) Unlike the pages of the NHTSA Presentation

just discussed, Mr. Engle states that pages 1, 2, and 31 (i.e., the title page, agenda, and information regarding data recording) are not confidential by themselves but only when considered in the context of the purpose for which the Presentation was created. (Id. ¶ 6.)

Defendant claims that the nature of the information contained on these pages of the NHTSA Presentation demonstrates that there are compelling reasons to overcome the presumption of public access: (1) the public right to this information is not absolute; (2) the information has not previously been made publicly available; (3) a Ford engineer has provided sworn testimony setting forth Defendant's objections to public dissemination of the information; (4) Defendant has an interest in protecting its trade secrets and confidential information; (5) Defendant will suffer prejudice if the information is not protected; and (6) the document is not integrally related to the merits of the case. (Def.'s Supplemental Conf. Desig. Mem. at 6, 11.)

In response, Plaintiffs argue that the NHTSA Presentation is a judicial record because the information contained therein regarding certain failures that cause UA goes to the merits of the case. (Pls.' Resp. to Def.'s Supplemental Br. in Supp. of Renewed Mot. to Preserve Conf. Desig. Pursuant to Protective Order [Doc. No. 257] (filed under seal), at 3.) Plaintiffs claim that the information is not entitled to protection because "the interests of justice . . . and public safety" require that it be made public, some of the information is available in other public documents, some of the information relates to past or present design developments and is stale, and Mr. Engle's declarations are contradicted by the facts. (Id. at 4–6.)

The Court finds that the NHTSA Presentation constitutes a judicial document because it was filed in conjunction with a dispositive, merits-based motion and, as discussed at various points in this Memorandum Opinion and Order, is relevant to the issues at the heart of this litigation. However, the Court also finds that, at this stage of the litigation, pages 5, 7, 9, 16, 18, 20, and 22–29 of the NHTSA Presentation are to remain subject to the Protective Order entered in this case. Defendant has adequately demonstrated the confidential and proprietary nature of the information contained on those pages and—for purposes of maintaining its confidentiality through summary judgment—has shown compelling reasons to overcome the public's right to access that information. To the extent that Plaintiffs intend to rely on these pages at trial, the Court will at that time reconsider this ruling if presented with a reasonable alternative to sealing those pages. But see Webster Groves Sch. Dist., 898 F.2d at 1377 (finding that there was no reasonable alternative to sealing the file at issue because "[the court] cannot unseal the record and then restrict dissemination of the sensitive information therein" and "redaction of the file would be virtually impossible because it [was] 'replete with [confidential information]'"). On the contrary, Defendant's allegations regarding the confidential nature of pages 1, 2, and 31 are too vague to demonstrate compelling reasons to warrant preservation of their confidentiality. For these reasons, Defendant's Renewed Motion to Preserve Confidential Designation is granted in part and denied in part.

## VI.   ORDER TO SHOW CAUSE

Various submissions of the parties were filed under seal. If the parties believe that any portion of this Order warrants redaction, the Court orders the parties to show cause

ten days from the date of this Order, stating why the Order should not be unsealed and

specifying any portion of the order warranting redaction.

## VII.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Defendant's Renewed Motion in Limine to Exclude the Testimony and Opinions of Neil Hannemann [Doc. No. 193] is **GRANTED IN PART AND DENIED IN PART**, as detailed herein;

2. Defendant's Renewed Motion in Limine to Exclude the Testimony and Opinions of William Berg [Doc. No. 199] is **DENIED**;

3. Defendant's Renewed Motion in Limine to Exclude the Testimony and Opinions of David Bilek [Doc. No. 203] is **DENIED**;

4. Defendant's Renewed Motion for Summary Judgment [Doc. No. 189] is **GRANTED IN PART AND DENIED IN PART**, as detailed herein;

5. Defendant's Renewed Motion to Preserve Confidential Designation Pursuant to Protective Order [Doc. No. 208] is **GRANTED IN PART AND DENIED IN PART**, as detailed herein; and

6. The parties are ordered to show cause ten days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.


Dated:  December 30, 2015           s/Susan Richard Nelson
                                    SUSAN RICHARD NELSON
                                    United States District Judge